PISCATAWAY ASSOC., INC., *ET AL.,* PETITIONERS-APPELLANTS, v. TOWNSHIP OF PISCATAWAY, RESPONDENT-RESPONDENT.

Argued March 7, 1977—Decided June 15, 1977.

548

*Mr. Leo Rosenblum* argued the cause for Petitioners-Appellants (*Messrs. Rosenblum & Rosenblum,* attorneys).

*Mr. M. Roy Oake* argued the cause for Respondent-Respondent.

The opinion of the court was delivered by

SCHREIBER, J. ■ Appellants, Piscataway Associates, Inc., Kaplen, Geiger, Chandler Associates, and Chandler and Piscataway Associates, Inc., owners of a garden apartment complex in the respondent Township of Piscataway, have appealed from a judgment of the Appellate Division holding that they had not established that the 1973 tax assessment on their property was unduly discriminatory and therefore invalid. The appeal was filed as of right, the appellants asserting that a substantial constitutional question was involved. *N. J. Const.,* Art. VI, § V, par. 1(a); *R.* 2:2–1(a).

This procedure was improper and in disregard of the guidelines enunciated in *Tidewater Oil Co. v. Mayor and Council of Carteret,* 44 *N. J.* 338 (1965).

In *Tidewater* we pointed out that to justify an appeal as of right "there must appear indication of true merit from the constitutional point of view, *i. e.* that the issue tendered is not frivolous and has not already been the subject of a conclusive judicial determination." *Id.* at 342. That standard is not satisfied in this case. The issues here involve an analysis of a particular factual situation and application of those facts to statutory and constitutional criteria under established principles. A case falling into this classification is not appealable as of right. We would customarily dismiss proceedings when a petition for certification has not been filed in accordance with the procedure outlined in *Tidewater,* 44 *N. J.* at 344. However, after examining the case, we find that the general public

importance of the questions presented warrants their being considered and accordingly have granted certification *nunc pro tunc*. R. 2:12–1 and R. 2:12–4.

In *In re Appeal of Kents 2124 Atlantic Ave., Inc.*, 34 N. J. 21 (1961), Chief Justice Weintraub wrote for a unanimous court that, upon a showing of substantial unequal treatment in assessments of real property within a municipality, caused by a failure to comply with the law, relief should be granted to the taxpayer where there is a reasonable basis for compensating the wrong. *Id.* at 29. These requirements have been met here.

The sole issue before us is the taxpayers' claim of discriminatory tax treatment for the year 1973. The facts are essentially undisputed. The Township had revalued all property within the municipality and new assessments became effective for the tax year 1965. The 1965 tax rolls were continued by the assessor through 1972. The assessor, finding that the State Director of Taxation's average sales ratio[1] on October 1, 1972 was about 33%, then multiplied each assessment uniformly throughout the municipality by three. He used the resultant figure, believing that it represented the full true value for the year 1973.

The garden apartment complex owned by the appellants was constructed between 1966 and 1970 and located on 76 acres of land in the Township of Piscataway. The property had been assessed, based upon 1965 values, at $4,808,300 in 1971 and 1972. In 1973 the assessment was raised to $15,031,200. The State Division of Tax Appeals found that its true value for 1973 was $13,065,243. The Appellate Division concurred, holding that sufficient credible evidence existed in the record to justify that result. We have, there-

---

[1]The State Director of Taxation, pursuant to N. J. S. A. 54:1–35.1, establishes a table of equalized valuations consisting of the relationship of assessments in the municipality to sale prices to ascertain the total true value of real property for the purpose of allocating State aid for education.

fore, an adjudicated specific finding that the 100% true value of the land and building for 1973 was $13,065,243.

The Director's average sales ratios for 1973, on the basis of 242 sales, was 76.44%, that is, the assessments were approximately equal to three-fourths of the sales prices. Of that number, 38 sold at prices equivalent to or higher than 90% of their assessed values. But over 200 sales were made at amounts less than 90% of the assessed value and 166 at less than 80%. There having been an adjudication that the petitioners' property was evaluated at 100% of true value for 1973 and there having been actual sales of a substantial number of properties in the Township demonstrating that the assessed values were on the average approximately 25% less than true value, the Division of Tax Appeals was satisfied that discrimination had been proven.

The Appellate Division disagreed. It found that the common level of assessments made in 1965 continued through 1972, that the township board of assessors assessed at 33% of true value for the year 1972, a year in which the Director's ratio was 32.39%; and that multiplying each assessment by three for the year 1973 maintained that uniformity. It concluded that a common level of assessment existed in 1973 and that the taxpayer had not shown that its property had not appreciated in value since 1965 to the same extent as other properties in the municipality.

When the revaluation was made in 1965, a common level of assessment existed throughout the municipality. The carrying over of assessments thereafter assumed that the percentage increase in value of each property remained the same. Although each year assessors should review and, where appropriate, change valuations, we recognize the impracticality and difficulty of fulfilling that duty. We have accordingly accepted the efficacy of a general revaluation for the years immediately succeeding its effective date. Thus in *Tri-Terminal Corp. v. Bor. of Edgewater,* 68 *N. J.* 405 (1975), *cert.* den., 425 *U. S.* 958, 96 *S. Ct.* 1739, 48 *L. Ed.* 2d 203 (1976), we accepted the general revaluation

effective for 1969 during 1971 and 1972. However, the vitality of this assumption dissipates with the passage of time. *The Handbook for New Jersey Assessors* (rev. ed. 1965) notes the problem:

If trends of property value were uniform throughout the taxing district, little attention would have to be paid to them, once all assessments were made on an equitable basis. Unfortunately, this almost never is the case. A great number of economic, social, and governmental influences will affect the properties within a taxing district in varying degree. In order to keep assessments equitable, the assessor must keep in constant touch with changing conditions. [*Id.* § 903.1 at 217]

Property values in a municipality as large as Piscataway will probably not increase at the same rate in all neighborhoods. We are cognizant, too, of other factors which may affect the value of particular properties, such as municipal rent control. (Piscataway has adopted such an ordinance.) Here, nine years had elapsed since the last revaluation, and the presumption that the values of all properties rose at the same or similar rate has been substantially undercut. In 1965 the properties were assessed at 100% of true value. Impairment of the uniformity of the 1965 assessments by 1971 and 1972 due to the uneven effect of economic forces on the various properties is reflected in the Director's sales ratios in those years. The bulk of the sales varied over a 20% spread in the relationship of assessment to value. In those years most sales fell between the 20% and 40% level.

When the municipality multiplied each assessment by three, it aggravated the disparity, and the common level created in 1965, which had been affected due to the uneven inflationary effect over eight years, was further weakened. The following table graphically demonstrates this impact:

| RATIO OF ASSESSED VALUE TO SALE PRICE | NUMBER OF SALES IN: | | |
|---|---|---|---|
| | 1971 | 1972 | 1973 |
| 0–10% | 2 | 2 | 0 |
| 10–20 | 16 | 20 | 0 |
| 20–30 | 159 | 301 | 1 |
| 30–40 | 171 | 106 | 4 |

| RATIO OF ASSESSED VALUE TO SALE PRICE | NUMBER OF SALES IN: | | |
|---|---|---|---|
| | *1971* | *1972* | *1973* |
| 40–50 | 25 | 20 | 12 |
| 50–60 | 8 | 8 | 12 |
| 60–70 | 4 | 1 | 54 |
| 70–80 | 2 | 2 | 83 |
| 80–90 | 2 | 0 | 38 |
| 90–100 | 1 | 0 | 19 |
| 100–110 | 0 | 0 | 8 |
| 110–120 | 1 | 0 | 6 |
| 120–130 | 0 | 0 | 1 |
| Over 130 | 1 | 0 | 4 |

It can be seen that in 1971 and 1972 almost all the sales were clustered in the 20% to 40% range. However, the automatic tripling of assessments in 1973 caused an expansion of the range so that the bulk of the sales occurred between 40% and 100%. The effect of tripling the assessments may be illustrated in the following example:

| Property | *1972 Assessment* | *1972 Ratio to true value* | *1973 Assessment (3 times 1972)* | *1973 Ratio to true value* |
|---|---|---|---|---|
| A | $5,000 | 50% | $15,000 | 150% |
| B | $3,333 | 33% | $10,000 | 100% |

A $1,667 difference in 1972 has increased to $5,000 in 1973 and a percentage difference of 17% in 1972 has grown to 50% in 1973.

█ █ The taxpayer has shown that in the year 1973 it was assessed at 100% of true value, whereas the sales of other properties disclosed an average ratio of 76.44% and more than 68% of those sales were at 80% or less of true value.

The foregoing discussion demonstrates that this factual pattern should be covered by the principle enunciated in *Kents* that "relief should be granted upon a showing which satisfactorily reveals unequal treatment in violation of State law. . . ." 34 *N. J.* at 29. Where a taxpayer's realty is assessed at true value and such assessment is substantially higher than the common level generally applied to other properties, or, in the absence of a common level, than the

average ratio of the Director of Taxation, then the taxpayer ordinarily will have shown discrimination and is entitled to relief.[2] *Feder v. City of Passaic,* 105 *N. J. Super.* 157 (App. Div. 1969). Though a general revaluation may have established a common level at a specific point in time, copying the assessment rolls yearly, in the absence of the assessors' reviewing individual properties to the extent feasible, *Tri-Terminal Corp. v. Bor. of Edgewater,* 68 *N. J.* at 413–414, or without regular periodic revaluations, may undermine that common level. The ratios of the assessments to the sales prices of the large number of sales in 1971 and 1972, the ratio ranges of the clusters of the bulk of those sales, when magnified three hundred percent in 1973, and an eight year lapse since the last general revaluation during a highly inflationary period sapped the foundations of the common level. Under these circumstances, the taxpayers who were assessed at 100% true value were entitled to the relief awarded by the State Division.

It may be noted that a general revaluation was made in 1975. That revaluation confirms the petitioners' claim, for though total ratables in 1975 were 36% more than in 1974[3]

---

[2]The use of "substantial" as a criterion affords the fact finder a certain flexibility. Compare the applicability of substantial factor to determine causation in negligence actions. *O'Brien v. Bethlehem Steel Corp.,* 59 *N. J.* 114, 124 (1971). It may be noted that the Legislature has proposed a more definitive yardstick.

*N. J. S. A.* 54:1–35a fixes a "common level range" which is plus or minus 15% of the average ratio found by the Director of the Division of Taxation for the taxing district. In any proceedings before the Division of Tax Appeals, the Division is authorized where the ratio of the assessed value to true value exceeds the common level range, to revise the taxable value of the property by applying the average ratio to the true value of the property. *N. J. S. A.* 54:2–40.4b. This act is to be effective commencing with the tax year 1978. *L.* 1976, *c.* 33.

[3]We recognize that the 1975 ratables included some structures built in 1974. Building permits issued in 1974 totalled $21,851,000 of construction. Even if all that additional construction had occurred in 1974, the percentage increase in total ratables from 1974 to 1975 would have been more than 31%.

(aggregate assessments were $429,251,000 in 1974 and $586,034,300 in 1975) the assessment on the property in question increased by only 3.43%. (In 1974 the property had been assessed at $15,031,000 and in 1975 at $15,548,000.) If the 1974 assessments had been at 100%, an increase of 36% would have resulted in an average ratio in 1975 of substantially more than 100%. But the Director's table for 1975 shows an average assessment to sales ratio of 95.83%, so that the 100% assessment was achieved in 1975 and not in 1973. These data confirm the indication that in 1973 the average general level of assessments was less than 80% — when the taxpayer was assessed at 100%.

Comparison of the 1973 true value of the property in question of $13,065,243 as determined by the Division of Tax Appeals with the 1975 revaluation of $15,548,000 reflects a 19% increase. On the other hand, comparison of all the property evaluations reveals an increase of over 41% ($413,714,700 in 1973 to $586,034,300 in 1975). This, too, confirms the adverse discriminatory treatment directed against the taxpayer.

■ It has been contended that because *Kents* type relief may be productive of a substantial degree of relative unfairness among taxpayers, the remedy should not be available here. That rationale was rejected in *Kents*. There the Chief Justice persuasively answered as follows:

It is argued a reduction to the average ratio will increase the burden upon other properties assessed above it, and indeed if sufficient reductions should be granted the average itself will be progressively driven down. Abstractly, all of that is so, unless someone concurrently raises assessments which are below the ratio. But the criticism goes not to the justice of granting relief but rather to the amount of it. Mathematical perfection in taxation is unobtainable, and hence relief should not be denied merely because the result lacks absolute precision. The injured taxpayer is entitled to practical relief.

Moreover the remedy we find appropriate has an added virtue, for if a flood of appeals should ensue or be feared, it may well quicken the official conscience and induce the district to revalue and to keep the rolls current. It must be borne in mind that whether the stan-

dard of valuation is full true value or such percentage of it as may in the future be established under *chapter* 51 of the *Laws* of 1960, the vice of unequal treatment will persist so long as the assessor fails to do his job. The remedy of *Switz*[4] and the remedy we here find suitable will combine, we hope, to excite the assessor to proper performance. [34 *N. J.* at 32–33]

The Appellate Division has drastically restricted the general proposition enunciated in *Kents* to those situations where there is found a condition of complete planlessness in local assessments. If that reasoning were followed, a taxpayer would be denied relief even though its property was assessed at 100% of true value while the properties of others were being assessed at 33% of true value, provided that a general revaluation had been made within a decade. In addition the dissenting opinion would limit *Kents* type relief to those cases where the assessor has not in good faith attempted to achieve a common level. A fair reading of *Kents* does not support that interpretation. Rationally it would be absurd to deny relief because an assessor's intent was *bona fide* albeit the result was a level which was wholly disproportionate. A taxpayer who is shouldering substantially more than his fair share of taxes would rarely, if ever, obtain relief.

Judge Conford, writing for a unanimous court in *Tri-Terminal Corp. v. Bor. of Edgewater,* recognized that:

It is fundamental that a taxpayer is entitled to "treatment commensurate with that given his fellow taxpayers within the municipality" and that if it is not accorded, he is entitled to a judicial or quasi-judicial remedy. *In re Appeals of Kents 2124 Atlantic Ave., Inc., supra,* 34 *N. J.* at 25; *Feder v. City of Passaic,* 105 *N. J. Super.* 157, 160–161 (App. Div. 1969). [68 *N. J.* at 409]

When the taxpayer has shown that there is being imposed upon him an undue burden because it is so disparate when compared with others generally, as here, he is entitled to relief. To countenance any other result would ignore the

---

[4]*Switz v. Middletown Twp.,* 23 *N. J.* 580 (1957).

principle of equal protection guaranteed by our State Constitution and applicable statutes.

The judgment of the Appellate Division is reversed and the judgment of the State Division of Tax Appeals reinstated.

CONFORD, P. J. A. D., Temporarily Assigned, dissenting. The judgment of the Court here appears superficially to rectify discrimination in the assessment of the property of a particular taxpayer. Actually, as will be shown, it accomplishes discriminatorily favorable treatment for that taxpayer in relation to many other taxpayers in the municipality. Moreover, it encourages a breakdown of the uniformity and regularity of the tax rolls. It was for these reasons, implicitly, that in our recent unanimous decision in *Tri-Terminal Corp. v. Bor. of Edgewater,* 68 *N. J.* 405 (1975), cert. den. 425 *U. S.* 958, 96 *S. Ct.* 1739, 48 *L. Ed.* 2d 203 (1976), we strictly confined the discrimination remedy announced by the Court in *In re Appeals of Kents 2124 Atlantic Ave. Inc.,* 34 *N. J.* 21 (1961) (*"Kents*-type relief") to the conditions specifically laid down in that case for such relief. These were that there be no demonstrable "common level" for assessment of property generally in the taxing district *and* that "the assessors disavow any effort to achieve one". 34 *N. J.* 31. Then, and only then, could the "average ratio" (of aggregate sales prices to aggregate assessments), annually determined by the Director of the Division of Taxation from sales studies in each taxing district,[1] be taken presumptively as the "common level" to which a taxpayer's property assessment might be reduced if substantially above that level. *Tri-Terminal Corp., supra,* 68 *N. J.* at 409–410.

---

[1]These sales studies are conducted by the Director solely for the purposes of aiding distribution of state aid to school districts and as guides for establishment of county equalization tables. *Tp. of Willingboro v. Burlington Cty. Bd. Tax,* 62 *N. J.* 203, 209 (1973). They have nothing to do with the setting of individual property tax assessments.

In *Tri-Terminal Corp.*, the complaining taxpayer made a case substantially like that of the present appellant. It showed there was an average assessment ratio of about 68% for the tax years there in question and it sought a reduction of the adjudicated true value of its property down to that percentage. We affirmed the Appellate Division in refusing to do so because we found that all property, including the appelant's, *was purported* to be assessed at a uniform common level. 68 *N. J.* at 411–412. It made no difference that the sales study there showed variations in assessment ratios of individual properties from 23% to 108%, 68 *N. J.* at 413, or that the average ratio of all sales, as indicated above, was 68%.

In principle, the Court now retreats substantially from *Tri-Terminal Corp.* Although the factual pattern here is different, the case is the same in principle in that, as well demonstrated in the Appellate Division opinion, 139 *N. J. Super.* 276 at 281,[2] the instant assessor purported in good faith to maintain a common level in the taxing district for the year in question, 1973, and that level was 100%. The taxpayer was therefore not entitled to the *Kents*-type relief.

As we explained in *Tri-Terminal Corp.*, the *Kents*-type remedy was avowedly an extreme one, designed to shock taxing districts whose assessors were functioning planlessly into the salutary practice of regular periodic revaluations. 68 *N. J.* at 410. *Kents*-type relief was obviously contemplated to

---

[2] For the year 1965, when a revaluation was put into effect, the common level was 100%. Thereafter, until 1973, 1965 valuation standards were used for assessing new construction, including the property of appellants. In 1971 and 1972, because of inflated market values, the assessor recognized a common level of 35%. In 1973 the county board of taxation directed that a 100% level be used. This was effected by multiplying all valuations of record by 3. The accuracy of the resulting valuations is not issuable on a discrimination appeal, only whether the assessor purported to be applying a common level in good faith. In this case there can be no doubt that he did.

be used only in the exceptional case where no *bona fide* effort
at uniform assessments was being made by the local assessors,
as where no effort at periodic revaluations was made or no
common level maintained in some other way.

The mischievous potentialities of routine allowance of
*Kents*-type relief are readily apparent against the background
of continuously rising realty values such as we have had for
several decades and bid fair to continue for the foreseeable
future. The average municipality cannot afford a complete
tax revaluation more often than every five to eight years.
This means that between revaluation years, with assessments
customarily being repeated yearly until the next revaluation,
there will, in a steadily rising realty market, always be average
assessment ratios below 100%, sometimes substantially so.
To the sophisticated taxpayer or his legal advisor, such a
situation constitutes an invitation to bring a discrimination
appeal every year to get the assessment reduced down to the
level of the average ratio. And if, as by the decision of the
Division of Tax Appeals in the instant case, the appealing
taxpayer is successful, his reduction in tax dollars will have to
be made up by the general body of unsophisticated taxpayers
who have not appealed. *Ex hypothesi,* and under the law of
mathematical probability, about one half of those taxpayers
will have been assessed at a higher ratio level than the
average ratio level to which the appellant taxpayer has been
reduced. The appellant will thus have achieved a discrimina-
tory benefit *vis a vis* all of such other taxpayers. Moreover,
if a substantial number of taxpayers file for *Kents*-type re-
lief and succeed, the result is simply to drive the average
ratio even lower, proliferating still more appeals and com-
pounding the disarray of the assessment rolls in terms of uni-
formity. The result is one set of taxpayers assessed at the
common level the assessor is following and another set (the
appealers) at the lower average ratio.

Complicating the picture is the fact that *Kents*-type re-
lief is granted only when the ratio of actual assessment is

"substantially"[3] above the Director's average ratio, and in such case the assessment reduction is all the way down to the average ratio, *Kents, supra,* 34 *N. J.* at 32; *Tri-Terminal Corp., supra,* 68 *N. J.* at 410. Taxpayers assessed above, but not "substantially" above, the average ratio, cannot qualify for any relief under *Kents*. The unfairness of the resulting treatment of such taxpayers is obvious.

When considerations like those just mentioned were raised in the *Kents* case itself against allowance of that form of relief, one of the responses of the Court was that the resulting "flood of appeals" from granting reductions down to average ratios would "induce the district to revalue and to keep the roles current". 34 *N. J.* at 32. But in the present case that stimulus is not necessary as Piscataway did revalue during 1974 for the tax year 1975, having previously done so for the year 1965, and it is to be hoped that it will do so in the future at shorter intervals than 10 years. Only in that way can practical uniformity in assessments be achieved; certainly not by the scatter-gun effect of random discrimination appeals of the *Kents* type. The fact, noted by the majority, that between revaluations different properties may well rise at different rates of valuation, is not a good reason for routine *Kents*-type relief. Relative uniformity as between all properties in a taxing district cannot be achieved by separate valuation appeals on separate properties or by "discrimination" appeals, but only by periodic revaluations of entire taxing districts at one time. As already noted, the *Kents* remedy was an extreme one, devised for a condition of complete planlessness in local assessments. Its use is best avoided when such conditions do not exist currently in the municipality involved. Unfortunately the Court's decision today encourages such appeals.

---

[3]The subordinate issue of what is a "substantial" difference between the average ratio and the actual assessment ratio contributes another element of uncertainty to *Kents*-type litigation.

A final observation. The 1975 true value of the property here involved as shown by the 1975 revaluation was $15,548,000, as compared with the adjudicated 1973 "true value" fixed by the Division of Tax Appeals at $13,065,243, or about 19% more. Unless it is to be supposed that the true value increased by that percentage within two years, the revaluation figure, arrived at on a basis of relative uniformity with all other property in the taxing district, casts doubt on the reliability of the adjudicated "true value", determined in the course of an isolated appeal. In turn, the justification for use of the adjudicated 1973 figure as a base for application of the 80% average ratio, as effected by the judgment of the Division of Tax Appeals, is similarly cast in doubt, even if *Kents*-type relief were otherwise appropriate in this case, as I believe it is not.

Chief Justice HUGHES and Justice SULLIVAN join in this opinion.

*For reversal*—Justices MOUNTAIN, PASHMAN, CLIFFORD and SCHREIBER—4.

*For affirmance*—Chief Justice HUGHES, Justice SULLIVAN and Judge CONFORD—3.