FABKAP ASSOCIATES, PLAINTIFF, v. BOROUGH OF
BELMAR, DEFENDANT.

Tax Court of New Jersey

October 28, 1980.

554

*Kenneth D. McPherson* for plaintiff (*Waters, McPherson, Hudzin & McNeill*, attorneys).

*Saul A. Wolfe* for defendant (*Skoloff & Wolfe,* attorneys).

ANDREW, J. T. C.

Plaintiff seeks a reduction in its local property tax assessment for the tax years of 1974, 1975 and 1976 based on its allegations that the assessment is in excess of true value and that the subject property is assessed at a level of assessment substantially higher than the common level of assessments in the municipality. This matter was originally heard by a judge of the Division of Tax Appeals but by operation of statute was transferred to this court for determination. *N.J.S.A.* 2A:3A–26. The parties agreed that this matter should be determined solely on the record developed in the Division of Tax Appeals.

The subject property is designated as Block 107, Lot 1 on the tax map of the Borough of Belmar, commonly known as 1000 River Road. The assessments for the tax years of 1974, 1975 and 1976 which were affirmed by the Monmouth County Board of Taxation were:

| | |
|---|---|
| Land | $ 312,000 |
| Improvements | 1,658,000 |
| Total | $1,970,000 |

The subject of this proceeding is a nine–story, "L" shaped, apartment building consisting of a total of 104 rental units. The structure, commonly known as Del Rio Towers, is located on the easterly side of River Road (also known as State Highway Route No. 35) between Tenth and Eleventh Avenues in Belmar Borough. The site contains 1.791 acres of land and is approximately three–quarters of a mile from the Atlantic Ocean. Directly across the street from the subject is a municipal park and marina. The property is within a three–minute walk of a shopping center and a two–minute walk of the Belmar railroad station.

The improvement, which was constructed in the 1971 to 1972 time period and completed in November, 1972, consists of 79 one–bedroom apartments and 25 two–bedroom apartments. Every apartment is serviced by electric heating and air–condition-

ing and has a combination refrigerator–freezer, built–in electric range, dishwasher and exhaust fan. The tenant of each apartment is required to pay for heat, air–conditioning and light. There are laundry facilities, refuse disposal facilities and tenant storage lockers provided on each floor. Each apartment has a balcony and wall–to–wall carpeting over concrete flooring. The building is serviced by two automatic passenger elevators. There is adequate on–site parking facilities for the tenants.

There were two issues presented for determination, as previously stated, i. e., (1) whether the assessments were in excess of true value and (2) whether the subject property was assessed at a level of assessment substantially higher than the common level of assessments in the taxing district.

There was no dispute as to the value of the land. Both plaintiff's and defendant's appraiser indicated that the assessed valuation of the land represented fair market value for the tax years in question.

The taxpayer presented one appraisal expert who indicated that in this particular matter the primary approach to value was the income approach. It was the expert's opinion that properties of this type are bought and sold in the market based on their ability to produce income, therefore, the most appropriate method to arrive at market value was by means of an economic or income analysis.

Taxpayer's expert arrived at a different value for each tax year under consideration. His opinion of value for 1974 was $1,972,000. His estimate decreased to $1,670,000 for 1975 and was further reduced to $1,592,000 for the tax year of 1976. The primary reasons for the decline in estimated value were a decrease in economic rents and an increase in actual expenses attributable to the improvement. For the tax year of 1974, he estimated economic rent based on the owner's estimated rent roll for that year. For the subsequent years, he considered and accepted the owner's reduced rent schedule. His justification was that the landlord was experiencing excessive vacancies and, therefore, the rents had to be reduced in order to obtain or stimulate greater occupancy.

It must be noted that the subject improvement was ready for occupancy in November, 1972, and it was the opinion of the taxpayer's expert that it would take approximately two years for the building to enjoy full occupancy. Since full or near full occupancy was not achieved in 1974, the expert determined that the owner's original rent schedule did not represent economic rent. He utilized the owner's reduced rents as economic rents for 1975 and 1976 because the actual vacancies were still excessive. This was in spite of the fact that the owner's original rent roll for 1974 was in line with comparable rentals in the taxing district.

From the estimated gross annual income taxpayer's expert used a vacancy and collection loss factor of 3% for 1974 and increased the same to 5% for 1975 and 1976. The reason for the increase in the vacancy and collection factor was due to his review of the actual vacancies and his opinion that the vacancies were still excessive. He felt that 5% was a better estimate for the tax year 1975 and 1976. His estimate of expenses was 20.09% of gross rent potential for 1974, 22.66% for 1975 and 25.13% for 1976. He indicated that his expenses were the actual expenses incurred except for estimates in the area of repairs, maintenance, management, commissions, legal fees and accounting, which were stabilized averages.

Taxpayer's expert utilized an overall capitalization rate of 13.5% for 1974, 13.61% for 1975 and 13.8% for 1976. The reason for the slight increase each year was due to the increase of the tax rate of the municipality. His overall rates included 9% for return of investment, 2% for recapture of investment, and an effective tax rate of 2.5% for 1974, 2.6% for 1975 and 2.8% for 1976. As previously indicated, taxpayer's expert accepted the assessed land value of $312,000 as representative of true value for the tax years in question.

The expert who testified on behalf of the taxing district utilized all three approaches to value and arrived at a final value estimate of $1,970,000 for all three tax years. His cost approach value ($1,976,000), however, reflected a value for the improve-

ments for the year 1972, which was the year of revaluation. He supported his cost estimate by use of the actual cost incurred in the construction of the subject which was $2,578,490.

In his market data analysis, borough's expert relied upon one sale of an 82-unit apartment house located in Atlantic Highlands which occurred on July 31, 1970. The sale indicated a per unit value of $19,000 which when applied to the subject produced a value of $1,976,000.

Borough's expert employed the same figures and calculations for all three years in his utilization of a building residual income approach. His estimate of economic rents was $338,400 which estimate was similar to that of the taxpayer's expert for the tax year of 1974, i. e., $337,980. The expert for the taxing district then estimated a vacancy loss at 5% ($16,920) which was identical to the projection made by the taxpayer's expert for 1975 and 1976. He estimated expenses at 21.5% of gross income ($72,800) which when subtracted from effective gross income produced a net operating income of $248,680. He then deducted the income attributable to the land of $39,312 ($312,000 at 12.6%) giving rise to a net income to improvements of $209,368 which he capitalized at a rate of 12.896%.

The allocation of his overall capitalization rate was comprised of return on investment at 9%, real estate taxes at 3.6% and depreciation or recapture at .296%. This produced a value for the improvement of $1,623,511 to which he added the land value of $312,000 producing an overall value for all years of $1,935,500 (rounded).

■ A review of the testimony discloses that Belmar's cost approach was merely a summation of the value placed on the real estate in the revaluation year of 1972 with no up–dating of costs or depreciation. It was contended that this was supported by the actual cost of construction. It has been shown on a number of occasions that cost is not value. As was stated in *Bostian v. Franklin State Bank,* 167 *N.J.Super.* 564, 569, 401 *A.* 2d 549 (App.Div.1979), the original cost of construction should be considered but it is not controlling. A building which has been

overbuilt for whatever reason does not justify an expectation that the investment will be reflected in the building's market value. Expensive buildings are frequently sold for less than cost. *Id.* at 570, 401 *A.2d* 549. I find that the cost approach as applied by borough's expert and/or the original construction costs are not entitled to a great deal of weight in the search for the fair market value of the subject property.

■ The problem with the use of the market data approach by the borough's expert was that he did not make the court aware of his actual comparison process. He did not demonstrate any type of statistical support showing adjustments that were made from the comparable property to the property being assessed. He did not indicate the weight he gave to specific factors such as differences in time, location, physical characteristics or conditions of sale. It should also be noted that he relied upon only one comparable sale which provides little support for the development of a value estimate by the market data approach. *Parkview Village Assocs. v. Collingswood,* 62 *N.J.* 21, 30, 297 *A.2d* 842 (1972). It is clear that the weight to be given to an expert's testimony depends upon the facts and reasoning which form the basis for his opinion. *Passaic v. Gera Mills,* 55 *N.J.Super.* 73, 150 *A.2d* 67 (App.Div.1959), certif. den., 30 *N.J.* 153, 152 *A.2d* 171 (1959).

There is little question but that good appraisal practice requires the use of the three approaches to value when they are applicable. However, it is also clear that in many cases one approach to value will predominate. In *Parkview Village Assocs. v. Collingswood, supra,* the income approach was deemed to be the most appropriate in the assessment of an income producing apartment. See *Fort Lee v. Hudson Terrace Apts.,* 175 *N.J.Super.* 221, 227, 417 A.2d 1124 (App.Div.1980).

In my view, the economic approach will provide the most reliable indicator of value. I find this in spite of the fact that the subject was constructed in the 1971 to 1972 time period and that it was not initially ready for occupancy until November 1, 1972 (one year before the first assessment date). Although

there was not full occupancy for the tax year 1974, there was a rental history for the subject and comparable rentals which the taxpayer's expert reviewed in order to determine if the owner's estimated rent schedule was economic. (He found that it was).

For the reasons cited, I will place primary reliance on an economic analysis. In adopting this approach, the court is mindful of the care which this approach must be used and the admonition to check the answer produced thereby against the available data produced by all of the traditional approaches to value. *New Brunswick v. State of N. J., Div. of Tax Appeals*, 39 *N.J.* 537, 544, 189 *A.2d* 702 (1963).

It can be seen that the major differences between the economic analysis of both experts was the estimate of economic rent for 1975 and 1976 (their estimates for 1974 were similar, differing by only $420), their estimates of recapture and the proper tax rate to be applied. The court will consider these items beginning with the question of proper tax rate.

In order to determine the proper tax rate to be utilized a determination must be made with regard to the claim of discrimination. *Fort Lee v. Hudson Terrace Apts., supra*, 175 *N.J.Super.*, at 237, 417 *A.2d* 1124.

I

The record indicates that the taxpayer's expert opined that the sales–assessment ratios of the Director of the Division of Taxation reflected the common level, or that ratio to, or percentage of, full true value at which property generally was assessed in Belmar for the tax years involved. Taxpayer's expert developed different effective tax rates for each year as previously indicated because the Director's ratio was different for each year of appeal.

The assessor for the municipality testified that Belmar had been revalued in 1972 and that he had continued these values down to and including the years involved in this proceeding. He further indicated that he did not make any changes to the values established by the revaluation firm. Any new construc-

tion subsequent to 1972 was given a 1972 value through the use of a cost conversion factor which was determined by the revaluation firm and used in the 1972 revaluation. It was the opinion of the assessor, which was corroborated by Belmar's appraiser (whose firm did the revaluation in 1972), that Belmar was assessing at 100% of value. This was true even though property values were admittedly increasing in the taxing district since 1972. The assessor agreed, on cross–examination, that the sales–assessment ratio studies indicated that assessments were not at 100% of full true value. Borough's appraiser was of the view that the market value of the subject was increasing as were the rest of the properties in Belmar. In spite of that conclusion, his final value estimate for the subject for 1974, 1975 and 1976 was not in excess of the 1972 revaluation estimate but was equal to it ($1,970,000).

In *Tri–Terminal Corp. v. Edgewater,* 68 *N.J.* 405, 346 *A.*2d 396 (1975), our Supreme Court recognized the theory that when a revaluation is completed, a common level of assessment is achieved and that if the taxing district carries forward the same assessments to later years, the common level is still maintained even when properties have risen in value during that period. In order to establish that the common level has been substantially undercut, the taxpayer must show that its property was impervious to the increasing values of other properties in the taxing district as was accomplished in *Piscataway Assoc., Inc. v. Piscataway Tp.,* 73 *N.J.* 546, 376 *A.*2d 527 (1977).

The present matter differs from *Tri–Terminal* in that in *Tri–Terminal* there was unchallenged evidence that the property in the taxing district, including the taxpayer's property, was rising in value from 8% to 12% annually. In the instant case although the assessor and borough's expert indicated that all property within the district was on the increase, borough's expert testified that his final value estimate for the tax years of 1974, 1975 and 1976 was exactly the same as the value set in 1972, the year of revaluation. The value estimate of borough's expert belies the assertion that the subject property was increasing in value in accord with the general rising trend. On the

contrary, it clearly indicates that the taxpayer's property was not indeed part of that rising trend.

In *Tri–Terminal*, the number of usable sales in the Director's sales studies was a limited sampling (the sales for one of the years under appeal was approximately 2.3% of the total assessable parcels within the taxing district). This also existed in *Fort Lee v. Hudson Terrace Apts., supra,* 175 *N.J.Super.,* at 235, 236, 417 *A.*2d 1124, where discrimination relief was denied because of a failure of proof. In *Fort Lee* the sales (77) represented only a miniscule portion (1.8%) of a total of 4,269 assessed parcels. *Id.* at 236, 417 *A.*2d 1124.

■ In the present matter, taxpayer's expert presented an analysis of the statistical data published by the State Director of the Division of Taxation for the tax years of 1974, 1975 and 1976. The study consisted of 238 usable sales, or 10.5% of the total of 2,270 assessable line items within the borough. I find that the number of usable sales for the three year period constitutes a sufficient sampling to validate the sales–assessment ratios as a good indication of the common level of assessment. Additionally, it should be mentioned that the borough did not contend that there was a weakness in the sales–assessment ratios because of a paucity or inadequacy of sales during the period involved.

■ The Director's sales–assessment ratios for the years in question were as follows:

| 1974 | 78.68% |
| 1975 | 73.04% |
| 1976 | 68.18% |

The evidence as to the Director's studies indicates a substantial degree of uniformity of assessment for the tax years in question as is manifested by the clustering of sales around the average sales–assessment ratios. This was also reflected by the coefficients of deviation which were as follows:

| 1974 | 20.80 |
| 1975 | 21.44 |
| 1976 | 17.10 |

The coefficients, if below 20%, indicate that a relatively good assessment practice exists in a municipality. However, while the ratio studies, ratio clusters, and coefficients of deviation may indicate that the assessing practice was fairly good, these statistical tools do not indicate that real estate in Belmar was assessed at 100% of true value. Rather, these statistical studies indicate the existence of a common level considerably below 100% of true value.

I find based on the record produced at the hearing before the Division judge, that a common level did exist within Belmar during the tax years of 1974, 1975 and 1976. However, it is clear that this common level was not 100%. The ratio clusters indicate a level within the range of 60% to 79% supporting the opinion of taxpayer's expert that the common level was the Director's ratio for the three tax years. This conclusion is supported by the coefficient of deviation for each year. However, I find, that in the interest of stability of assessments and adequacy of a sales–sampling base that the average of the three Director's ratios should be used to provide relief. *New Brunswick v. State Div. of Tax Appeals, supra*, 39 *N.J.* at 541, 189 *A.2d* 702; *Feder v. Passaic*, 105 *N.J.Super.* 157, 162, 251 *A.2d* 457 (App.Div.1969).

Therefore, pursuant to *Piscataway Assoc., Inc. v. Piscataway Tp., supra*, 73 *N.J.* at 554, 376 *A.2d* 527, the taxpayer has demonstrated that its property is assessed at a substantially higher ratio of true value than the common level of assessment applied to other properties. This court is aware that a revaluation was performed in 1972 and that practical and economic realities preclude the implementation of a revaluation or assessment every year. However, a taxpayer who is shouldering substantially more than his fair share of taxes is entitled to relief. *Id.* at 556, 376 *A.2d* 527.

Defendant has presented the issue of whether the ratios to be utilized should be those of the assessment dates, i. e., October 1 of the pretax year, or the ratios which are promulgated as of the tax year in question. In *Feder v. Passaic, supra*, the Appellate

Division used the ratios of the Director promulgated during the tax years in question for those tax years. The merit of this approach can be seen in that fact that the latest sales samplings are used to reflect the current common level. It would appear that the latest sales would be the better determinant of common level during a particular tax year, hence I find that the common level is reflected by the average of the Director's ratios promulgated during the tax years in question.

In the determination of value to be made by the court via the income approach the effective tax rate will be utilized for the reasons heretofore given. The effective rate will be calculated by utilizing the average tax rate for the three years in question . multiplied by the average of the three Director's ratios.[1]

## II

As previously stated, the experts for the parties differed in only two areas other than the question of the proper tax rate to utilize. Taxpayer's expert and borough's expert differed with regard to economic rent and also with regard to the proper rate of recapture.

■ The first step in the income approach to value is to estimate potential gross fair market or economic income. Economic rental is that rental warranted to be paid in the real estate market based on rentals paid for comparable space. *American Institute of Real Estate Appraisers, The Appraisal of Real Estate,* (7 ed. 1978) 329.

---

[1] 1974 tax rate      3.209
1975 tax rate      3.494
1976 tax rate      4.106
             10.809 ÷ 3 = 3.603 Average tax rate

1974 Director's ratio    78.68%
1975 Director's ratio    73.04%
1976 Director's ratio    68.18%
             219.9 % ÷ 3 = 73.3 Average Director's ratio

3.603 × 73.3 = 2.64 – Effective tax rate

Taxpayer's expert accepted the owner's rent schedule for 1974 as being consistent with economic rent primarily because rentals for the subject were consistent with rents obtained in other multi–family dwellings in the borough. However, the subject suffered an unusually high vacancy rate which caused the owner to lower rentals for 1975 and 1976. It was the expert's opinion that economic rental was then reflected by the reduction in rentals by the owner. Therefore, he reduced his estimate of gross rent potential for 1975 and 1976, hence his lower value estimate for those years from his 1974 estimate of $1,972,000.[2]

Taxpayer's expert reasoned that the initial renting period or "character forming period" should not exceed two years (1972 to 1974). However, high vacancies persisted in 1975 and 1976. He noted that they were not due to the rental structure, therefore, he concluded that they must have been the result of inferior location and the increase in costs which the tenants had to absorb when Jersey Central Power and Light increased its electric rates. The testimony of taxpayer's expert does not substantiate the high vacancy rate to be a result of location. His testimony and that of the taxing district's expert indicate that even though the property is not located on the ocean it is still in a highly desirable and aesthetic location. It is directly across the street from a marina and municipal park and is a relatively short walking distance from a shopping center and the Belmar railroad station. These are amenities which enhance its location and would not cause location to be a reason for excessive vacancies. I find I must accept the opinion of the borough's expert that the location of the subject is comparable to other multi–family dwellings located on the ocean.

The second reason advanced by the taxpayer's expert to explain the vacancies was the increase in utility rates which had to be borne by the tenants. He could not support this with any

---

2It should be noted that taxpayer's expert prepared an appraisal for the Monmouth County Board of Taxation wherein he estimated economic rent of $306,720 for the tax year 1974 and concluded his report with a final value estimate as of October 1, 1973 of $1,621,500.

percentage of increase or dollar increase conclusions. Borough's expert established that the increases were minimal. He indicated that the electric rates increased by 12% which caused an increase to a tenant of perhaps $3.60 to $6.00 per month. I find that this increase would not be the cause or a significant contributing cause to excessive vacancies.

One other explanation was advanced for the high vacancy rate. Borough's expert contended that the start up rental period for an apartment house such as the subject would be five years instead of two years as expounded by taxpayer's expert. I find this to be a more plausible explanation for the actual vacancy factor. I also find that when the owner reduced the rentals, he did so as a rental concession in order to induce greater tenancy. I find that the owner was required to do so also by the constraints of a negative cash flow problem caused by the debt service of a mortgage loan which concededly exceeded the value of the improvements. In order to overcome the negative cash flow and to increase occupancy at a faster rate the lower rental concession was offered. However, experience has shown that, after an initial concession is granted, it is subsequently removed especially where rent levels in an area can be expected to increase and here both experts have so indicated.

Therefore, I find that I cannot accept the rent schedule advanced by the taxpayer's expert for 1975 and 1976 as representing economic rent. Rather, I find that economic rental is indicated by the rent schedule originally adopted by the owner which was consistent with rentals received for similar type rental units within Belmar. This estimate was $337,980 and was utilized by taxpayer's expert for 1974 and by borough's expert (with a minimal difference of $420) for all years.

### III

The last area of disagreement between the experts was with regard to the amount or percentage to be allowed for recapture

or return of the investment. Taxpayer's expert utilized a straightline method and allowed 2% for recapture indicating that the subject had an economic life of 50 years and therefore 2% of the building value would have to be recaptured each year. Borough's expert used an annuity method and estimated that full recapture would be achieved in 40 years by using a recapture rate of .296% or less than three–tenths of 1%. The basic difference is one of appraisal theory. Straightline recapture assumes that income will decline over the economic life of the improvement while the annuity method as utilized by borough's expert assumes that income will remain constant during this same period. While taxpayer's expert admitted that he expected gross rentals to increase he also indicated that expenses would also increase therefore net operating income would not remain constant over the economic life of the improvement, hence, the use of straightline recapture is justified.

■ I will disregard the use by the borough's expert of an annuity method of recapture because there is no support in the record to indicate that this methodology is descriptive of the actual behavior of investors in the market. Our Supreme Court has indicated that it is not for a trier of fact to decide what an investor abstractly should want but rather what the typical investor does demand and obtain in transactions with willing sellers. *New Brunswick v. Div. of Tax Appeals, supra,* 39 *N.J.* at 551, 189 *A.2d* 702. This does not indicate that a method of recapture other than straightline is not acceptable but that more persuasive proofs are required to demonstrate what investors do demand and the manner in which such demands are calculated.[3] Until such proofs are forthcoming, it is felt that the traditional straightline recapture is a more reliable method of estimating the period over which and the rate at which an investor would

---

[3]Such proof might be a field study of comparable properties to support a conclusion of what is the most probable pattern of income over the economic life expectancy of an improvement.

expect to recapture his investment.[4]  I find that the recapture rate should be 2% (50 year economic life) in view of the fact that this apartment building was only one year old as of the first assessment date and also in consideration of the condition of and the allowance for maintenance on the subject property.

The parties both utilized a vacancy factor of 5% which I find to be fair and reasonable and therefore will adopt this estimate.

With regard to expenses, taxpayer's expert utilized the actual expenses incurred save for repairs, maintenance, management commissions, legal and accounting which were stabilized percentages of gross income.  The percentage of expenses varied from 20.09% of gross income in 1974 to 22.66% in 1975 and 25.13% in 1976, while borough's expert estimated expenses at 21.5% of gross income for all years.  I find that the actual average costs over the three tax years including the reasonable stabilized items advanced by taxpayer's expert presents a fair estimate for operating expenses.  This computes to 22.63% of gross income and equals the median year expenses.

The experts agreed on a rate of return on investment at 9% therefore I will accept such rate as constituting a fair and reasonable allowance.

I have already indicated that the land value will be $312,000 based upon the testimony of both experts.

█  Reconstructing the income approach pursuant to the foregoing, I find as follows:

| | |
|---|---|
| Gross Annual Rent | $  337,980 |
| Less vacancy and collection loss at 5% of gross rent | 16,899 |

---

[4]*The Real Property Appraisal Manual For New Jersey Assessors,* Volume 1 (3 ed. 1978) at 121 provides, "The straightline method is used whenever the investment does not assume any of the characteristics of an annuity such as an *apartment* or boarding house.  In other words, if the future income projection is speculative then this method is preferable." [Emphasis supplied]

| | |
|---|---|
| Effective gross income | $ 321,081 |
| Less operating expenses at 22.63% | 76,485 |
| Net income | $ 244,596 |
| Deduct income to land ($312,000 × 11.64%) (9% return + 2.64 effect. tax) | 36,317 |
| Net income to improvements | $ 208,279 |
| $208,279 capitalized at 13.64% (9% return 2% recapture and 2.64% effect. tax) (rounded) | 1,527,000 |
| Add Value of Land | 312,000 |
| Value for 1974, 1975 & 1976 | $1,839,000 |

Pursuant to this court's finding of discrimination in assessment as applied to the taxpayer, the average of the Director's ratios for the tax years in question will be applied to provide relief from discrimination. Application of this common level of 73.3% to the value will produce rounded assessed values for all years as follows:

| | |
|---|---|
| Land | $ 228,700 |
| Improvements | 1,119,300 |
| Total | $1,348,000 |

The Clerk of the Tax Court is directed to enter judgments for the tax years of 1974, 1975 and 1976 as indicated.