[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Plaintiff seeks judicial review of the Town of Lincoln's tax assessment of certain property known as the Collyer Wire facility, located at 400 Higginson Avenue, Lincoln and described as Plat 1, Lot 133 and Plat 2, Lot 65. The facility consists of a 29.5 acre parcel of land improved by a 480,000 square foot structure. This structure consists of approximately 443,272 square feet of manufacturing space and 36,300 square feet of office space.
Plaintiff, Wickes Asset Management, Inc. seeks relief from an allegedly excessive assessment for seven (7) consecutive years, all of which have been consolidated for trial. These cases represent the following dates of assessment:
 Case Number Date of Assessment Tax Year
 87-2103 December 13, 1985 July 1, 1986
 87-4753 December 31, 1986 July 1, 1987
 89-1204 December 31, 1987 July 1, 1988
 89-5493 December 31, 1988 July 1, 1989
 91-7766 December 31, 1989 July 1, 1990
 92-1672 December 31, 1990 July 1, 1991
 92-1671 December 31, 1991 July 1, 1992

As of December 31, in each of the years 1981 through 1985, the property was assessed at $7,419,490. As of December 31 in each of the years 1986 through 1991 the property was assessed at $7,373,490. The reduction reflected the Lincoln's consolidation of two parcels of land.
Plaintiff failed to file an account in accordance with G.L. 1956 (1988 Reenactment) § 44-5-15 for each of the aforementioned years. This Court conducted an extensive preliminary hearing to determine the extent of its jurisdiction and on October 1, 1992 issued a bench decision. The Court concluded the remedy provided in § 44-5-26(a) was not available to plaintiff and the plaintiff was thus limited to proving the illegality of the various assessments pursuant to § 44-5-26(b). See, Van Alen v. Stein,119 R.I. 347, 376 A.2d 1383 (1977); Kargman v. Jacobs,113 R.I. 696, 700, 325 A.2d 543, 547 (1974); Sayles Finishing Plants,Inc. v. Toomey, 95 R.I. 471, 188 A.2d 91 (1963).
Additionally, plaintiff sought to invoke the Court's equity jurisdiction pursuant to § 44-5-27 which provides:
 The remedy provided in § 44-5-26 shall be exclusive if the taxpayer owned any ratable estate at all, except that in a proper case the taxpayer may invoke the equity jurisdiction of the superior court provided that the complaint is filed within three (3) months after the last day appointed for the payment of the tax without a penalty or the first installment thereof, if the tax be payable in installments. A taxpayer alleging an illegal or void tax assessment against him or her shall be confined to the remedies provided by § 44-5-26.
Only three of these actions were filed within three (3) months after the last day appointed for the payment of the tax without a penalty. Those cases are as follows:
 Case Number Date of Assessment Tax Year
 87-4753 December 31, 1986 July 1, 1987
 89-5493 December 31, 1988 July 1, 1989
 92-1671 December 31, 1991 July 1, 1992

Thus the plaintiff is limited to challenging the legality of the assessment for all tax years and with respect to the tax assessments for December 31, 1986; December 31, 1988 and December 31, 1991 the plaintiff is limited to proving these are proper cases to invoke the Court's equity jurisdiction.
For a tax assessment to be illegal it must be made "outside the ambit of state law." Inn Group Associates v. Booth,593 A.2d 49, 51 (R.I. 1991). In this case no suggestion has been made that the subject property is tax exempt, St. Clare Home v.Donnelly, 117 R.I. 464, 368 A.2d 7214 (1972) or that the tax assessor has no jurisdiction over the parcels, Van Alen v.Stein, 119 R.I. 347, 376 A.2d 1383 (1977). Indeed, the bulk of the plaintiff's case rests upon its belief that for each of the tax years in question the assessment was so palpably excessive as to amount to constructive fraud and thus illegal. CIC-NewportAssociates v. Stein, 403 A.2d 658 (R.I. 1979).
It is axiomatic that assessors are accorded a presumption that they properly performed their official acts. A mere mistake in valuation resulting in an excessive assessment does not amount to illegal taxation. CIC-Newport Associates v. Stein, supra
at 662. The plaintiff, in attempting to prove an assessment is so palpably exorbitant as to amount to constructive fraud bears a heavy burden. Sayles Finishing Plants, Inc. v. Toomey,95 R.I. 471, 188 A.2d 91 (1963), Tripp v. Torrey, 17 R.I. 360 (1891).
Plaintiff also contends it is the victim of disproportionate taxation and the assessment is therefore illegal. Plaintiff bases this argument on an annual report prepared by the R.I. Department of Administration which contained a sales-assessment ratio for each of the state's cities and towns for each of the years in question. Fernandes Realty Corp. v. Lagace, ___ R.I. ___,401 A.2d 43 (1979). Plaintiff relies upon this report to support a charge of disproportionate taxation.
HISTORY OF OWNERSHIP
The Collyer Wire facility was constructed in 1962 by the Industrial Foundation of Rhode Island. The property, while owned by the Industrial Foundation of Rhode Island, was leased to the Collyer Wire Foundation, a part of Gulf and Western Industries. In 1985 Wickes Companies, Inc., a Delaware Corporation and a parent company of the plaintiff, Wickes Asset Management, Inc., purchased Gulf and Western Industries and the Collyer Wire business. As of May, 1987 the property was held by Wickes Foundation, a public benefit foundation for the benefit of the Wickes' pensioners. On December 28, 1987 Wickes Asset Management, Inc. purchased the property from the Wickes Foundation for $6.3 million. The circumstances of this purchase are relevant to a determination of this action.
Plaintiff presented the testimony of Mr. Bruce Edelson, a civil engineer and former long-term employee of Wickes Companies. Mr. Edelson testified that in February of 1986 he began employment with Wickes as Director of Corporate Facilities and was responsible for the maintenance and construction of corporate facilities. In 1989 he rose to the level of assistant vice president for Corporate Real Estate until April 1991 at which point he left the employment of Wickes and became an independent consultant with Wickes as his major client. The management and maintenance of the Collyer Wire property remains part of his consulting agreement with Wickes. The Court finds Mr. Edelson's testimony to be reliable and credible.
Mr. Edelson testified that he first visited the site in 1987. The facility was fully functioning at that time but Mr. Edelson was aware that as of 1987 Wickes was planning to sell Collyer Wire and close the facility. In November of 1988 the facility ceased its manufacturing functions. In January of 1989 the witness assumed responsibility for the preservation of the property.
The history of this facility since its closure as a wire manufacturing entity is sad and troubling. Mr. Edelson testified that since his first visit in 1987 he has visited the site approximately 20 times in connection with significant problems arising from the shutdown, environmental cleanup and chronic lack of proper maintenance and security.
A great deal of testimony was introduced concerning the roof of the building itself. In 1981 when the property was revalued by the Town of Lincoln, the assessor employed the reproduction cost less depreciation approach to valuation (discussed infra) and used a 20% depreciation figure. Gulf and Western, Wickes' predecessor in interest, requested an informal hearing with SLF, the town's tax equalization consultant.
At the informal hearing the taxpayer suggested a higher depreciation figure due to the condition of the existing roof. The town agreed and used a 25% depreciation figure based on the need to replace the roof.
In 1984 Collyer Wire, as a business expense, began a long-term roof replacement program consisting of a single-ply membrane roof covering the existing built-up roofing. No building permit was received from the town and Lincoln was never notified of these improvements. By November 1988, 70% of the roof had been replaced. The final stage was cancelled by Plaintiff and the remaining 30% of the roof was not replaced contrary to the advice of Mr. Edelson. Also against the advice of Mr. Edelson, a recommended long-term roof maintenance program was never undertaken.
As of April 13, 1990 Mr. Edelson reported to his superiors that "approximately one fourth of the roof is deteriorated beyond the point where repair is practical."
According to Mr. Edelson's in-court testimony the entire roof has now failed necessitating a complete replacement at a cost he estimates to be $1,250,000. This estimated cost has not been contradicted by Lincoln although previous estimates submitted by the plaintiff to the tax assessor and the Assessment Board of Review estimate a repair cost of $600,000.
In addition to the problems associated with the roof, Mr. Edelson testified about environmental cleanup work and other facility maintenance and repair costs. Much of the environmental cleanup work noted by Mr. Edelson has been accomplished in preparation for the ultimate sale of the property.
In determining whether plaintiff has met its burden of proof the Court rejects any consideration of costs for the replacement of boilers in 1984 and the roof in 1984, 1985 and 1987. The Court finds these costs as having been incurred by Collyer Wire prior to the shutdown of the facility and are declared to be business expenses. These costs have no relevance on the question of whether or not the tax assessment is illegal.
However, the Court finds there to be environmental cleanup work remaining which consists of removal of asbestos, removal of PCB laden transformers and removal of fuel oil tanks. The cost of this work is uncontradicted and found to be $232,000.
In addition to the cost of the roof, Mr. Edelson estimated the remaining facility repair and replacement costs to be $1,525,000. This figure is also uncontradicted.
Following the closure of the plant the plaintiff sold the manufacturing equipment. This sale was handled by a liquidation company which resulted in damage to the floor of the structure and damage to the electrical and plumbing systems.
In spite of Mr. Edelson's strong recommendation, plaintiff undertook little, if any, security measures. The lack of security led to vandalism of the plant. All copper pipes have been stripped and most of the windows have been broken.
On December 31, 1981, the tax assessor for the Town of Lincoln (at that time Leo Tellier) assessed the subject property and all other ratable property in the town pursuant to a town-wide revaluation. The assessor retained the services of a consultant, SLF, Inc. (hereinafter SLF) to assist in the revaluation. Both SLF and ultimately the town assessor considered all three approaches to valuation but primarily relied upon the cost of reproduction or cost approach to valuation.
An assessor is not bound by any particular formula, rule or method when he seeks to ascertain the fair market value of property. An assessor's choice of one of the recognized methods of valuation is simply an exercise of the discretion with which he is vested in performing his duties. Kargman v. Jacobs,325 A.2d 543 (R.I. 1974).
The defendant presented the testimony of Steven D. Hazard an employee of SLF, now Sabre/SLF Systems and Service. Mr. Hazard was project manager for SLF overseeing the Lincoln revaluation. He previously was the tax assessor for the Town of Foster, Rhode Island.
According to Mr. Hazard, employees of SLF inspected the property for purposes of rendering a recommended appraisal of the property to the Lincoln tax assessor.
While SLF relied upon the cost approach, Hazard testified a comparable sales analysis was informally done to allow SLF to check the figures it derived from the cost approach. Mr. Hazard also testified about comparable sales available to SLF at the time.
According to Mr. Hazard the Collyer property was classified as an industrial facility which was built in 1962. The manufacturing area consists of 443,272 square feet. It is a steel frame building with concrete block walls. The interior is open with ample room between the steel columns. The wall height is 18 feet.
The cost approach was accomplished by use of Marshall Swift current cost multipliers and local multipliers which allow for adjustments due to local labor rates, supply costs and age factors. Initially a 20% depreciation figure was suggested by SLF. However, at the owner's request this was increased to 25%. These calculations ultimately resulted in a tax assessment of $7,419,490. On December 31, 1981. This assessment was not challenged by the taxpayer.
The parties have introduced a plethora of real estate appraisals, some of which were prepared over the years for various corporate purposes. Others were prepared by real estate experts in order to challenge or defend the tax assessments.
These studies ranged from so-called desktop appraisals conducted by employees of plaintiff's real estate or taxation sections to more formal narrative appraisals performed by independent fee appraisers. These appraisals produced wide-ranging estimates of valuation, some actually in excess of the assessment plaintiff has challenged. On more than one occasion the expert's first estimate of valuation was lowered at the behest of Wickes. Those appraisals which are deemed relevant will be addressed separately.
THE BARKIN APPRAISALS
In 1987 plaintiff commissioned an independent appraisal from I.J. Barkin, Co., of Boston, Massachusetts. As previously noted the plaintiff commissioned numerous studies and appraisals for varying corporate purposes. According to Jeffrey P. Carpenter, plaintiff's employee and Manager of Real Estate, the purpose of the I.J. Barkin appraisal was to obtain an "arm's length" appraisal for an intra-corporate transfer of the asset. The trustees of Wickes Foundation a non-profit entity, were about to transfer the property to plaintiff, Wickes Asset Management, Inc., which sought to justify the purchase price paid to the public benefit foundation. This was accomplished by obtaining an appraisal which reflected the purchase price.
Daniel Clifford, a vice president at I.J. Barkin, Co., actually performed this appraisal. Mr. Clifford testified he employed both the capitalization of income approach and the market data or comparable sales approach in rendering his opinion as to value.
The capitalization of income approach usually involves rental property or income-producing property. "The income approach requires an expert to determine the amount of net income the owner of the subject property could reasonably expect to receive. This amount is then capitalized at an appropriate rate to arrive at the return a prudent investor could expect to receive on his investment. 5 Nichols on Eminent Domain § 19.01.
Even though the building was fully operational as a wire manufacturing facility as of December 15, 1987, the effective date of the Barkin appraisal, Mr. Clifford determined the highest and best use of the Collyer building was as a warehouse and distribution center.
There are serious flaws in the entire Barkin appraisal and the manner in which the appraiser changed his final figures after a meeting with Wickes. This Court rejects the appraisal in its entirety. Further, the appraiser's reliance on the income approach to valuation is also misplaced.
The property in question, for all relevant years was used as a wire manufacturing facility and was in reality owner-occupied. It was never leased out or owned by an investor. It is undisputed that at the time of the 1987 appraisal the plant was fully operational as a heavy manufacturing facility, not a warehouse. Further, the stated purpose of this appraisal was for the sale of the property by the non-profit Wickes Foundation to the plaintiff, Wickes Asset Management, Inc. Thus the appraiser's reliance on this highest and best use for the parcel as a warehouse facility is misplaced and rejected.
The income approach to valuation is also inappropriate for this property due to the sheer size of the structure. The town rejected the income approach to valuation on the ground that improvements to this property are not of the type and size which are leased or rented. Here lies the inherent problem with the application of the income approach in this case. No fair market rental income has ever been derived from the property.
Where property is rented for the use to which it is best adapted, the actual rent reserved, capitalized at an acceptable rate provides one of the best tests of value. 5 Nichols Eminent Domain § 19.02 (3rd ed. 1985). Evidence of rental value of similar neighboring property put to a similar use is not as reliable and may give rise to confusing collateral issues relative to the locations, size and degree of similarity of the two parcels as well as the terms of the lease.
But where, as here, the rental value is estimated based upon a potential new use of the property and a projected improvement of the structure, such evidence becomes more speculative and should be rejected. 5 Nichols Eminent Domain § 19.03[2] § 19.03[3] (3rd ed. 1985).
According to Mr. Clifford, in order for the subject parcel to become a warehouse and distribution facility, extensive and expensive retrofitting and renovation would be necessary. Mr. Clifford estimated the entire cost including overhead during construction to be $6,174,654. This estimate was derived from a detailed engineering study commissioned by I.J. Barkin, Inc. from Earl R. Flansburgh Associates, an architectural and engineering firm.
After he projected the rehabilitation costs, Mr. Clifford estimated the potential rental income for both the manufacturing space and the office space. He derived this estimate from a review of several leases of large space uses in Rhode Island.
Based on the fact the appraiser's estimate of value under the income approach is premised on a potential new use of the structure, the estimated cost of renovation, the speculative nature of the rental figures and capitalization rate, the Court rejects the income approach as a proper measure of valuation.
The Court also rejects all other aspects of Mr. Clifford's amended appraisal report with an effective date of December 15, 1987. The testimony established that I.J. Barkin submitted two separate appraisals to the plaintiff. The first appraisal labeled "DRAFT" was submitted to plaintiff on January 20, 1988. This first appraisal set a fair market value price of between $7,000,000. and $8,000,000., consistent with or in excess of the town's assessment.
According to Mr. Clifford, following the submission of this draft appraisal, the plaintiff met with the appraiser to discuss the draft report. Following this meeting I.J. Barkin submitted a new appraisal with an estimate of value between $6,300,000. and $6,500,000., a significant reduction.
Internal documents of plaintiff introduced by Lincoln demonstrate an intent to sell the property to Wickes Asset Management, Inc. for a predetermined price of $6,237,500. This purchase price was not only decided upon before Barkin was retained to conduct his independent appraisal, the Court finds the appraiser was given this figure. Further, the Court finds no supporting data to justify the drastic reduction in valuation.
Nonetheless on June 20, 1988 the Wickes Foundation transferred title to the property to Wickes Asset Management, Inc. The Court finds this was not an arm's length transaction. While Wickes may have intended the sale to be at fair market value, it was sold at below market value as a result of an undervalued sales price engineered by Wickes Corporate Real Estate section. Thus this "sale" is without any evidentiary value.
THE ENTERPRISE APPRAISALS
Enterprise Appraisal Company produced two appraisals of the facility dated March 30, 1987 and April 3, 1987. These appraisals were not relied upon by the plaintiff but were introduced by the defendant town. These appraisals were also commissioned by Jeffrey Carpenter who testified he was also endeavoring to establish a value for the property in 1987.
The Enterprise appraisal dated March 30, 1987 set a fair market value of $8,150,000. However, again the Wickes' executives did not agree with this figure. According to Mr. Carpenter he may have informed Enterprise Appraisal Company he did not agree with the appraisal. A second appraisal was sent to Mr. Carpenter with a revised estimate of $7,675,000.
Thus in 1987 plaintiff was in possession of four (4) separate appraisals prepared by two independent appraisal firms. The Barkin appraisals reflected an initial fair market value of between $7,000,000. and $8,000,000. The revised appraisal reflected a fair market value of between $6,300,000. and $6,500,000. The first Enterprise appraisal projected a fair market value of $8,150,000. and the revised appraisal with a fair market value estimate of $7,165,000.
With the exception of the second Barkin appraisal which the Court rejects in its entirety, these figures are close to or in excess of Lincoln's assessment during that period. The plaintiff has failed to demonstrate the assessment was so palpably exorbitant as to amount to constructive fraud. Sayles FinishingPlants, Inc. v. Toomey, 95 R.I. 471, 188 A.2d 91 (1963).
THE PHARR APPRAISALS
The plaintiff presented the testimony of Mr. Carl Pharr, an employee of Wickes from 1983 to 1988. Mr. Pharr worked in the Property Tax Department of Wickes Companies, Inc. until 1988 when he joined the firm of Ennes Associates, a property tax services firm which assumed responsibility for all property tax matters for plaintiff.
Mr. Pharr's duties included monitoring the tax assessments of all Wickes' real estate holdings to guard against excessive property taxation. Mr. Pharr, apparently independently of Mr. Carpenter's real estate section, conducted his own investigation of Collyer Wire and performed his own appraisal. This was accomplished by a telephone survey of various real estate brokers in Rhode Island in order to ascertain market rents and comparable sales.
Mr. Pharr maintained it was inappropriate for the Lincoln tax assessor to rely upon the cost approach to valuation and, in an appeal to the town's Tax Board of Review submitted his own appraisal.
Mr. Pharr's estimate yielded a fair market value of $6,150,000. as of January 1, 1986. The Court finds this figure to be unreliable and not supported by credible evidence.
While Mr. Pharr used the three recognized approaches to valuation, his application of those approaches to the Collyer Wire plant was clearly wrong.
In computing the cost approach to valuation Mr. Pharr utilized Marshall Swift's valuation service, a well-recognized resource for real estate appraisers. This exercise resulted in a "total value by cost approach" estimate of $7,690,717., a figure in excess of Lincoln's assessment.
Mr. Pharr then proceeded to deduct 21% of this figure for "economic obsolescence", a deduction typically based upon adverse forces external to the property itself. This 21% discount was inappropriate and without factual foundation necessary to support its use and is a departure from the guidelines set by Marshall 
Swift.
Pharr also used the income approach to valuation and asserted this was an appropriate approach to valuation because the property was leased property. This is simply not the case. The Collyer plant was never leased by a landlord to a tenant in an arm's length transaction for anything approaching market rent.[1]
Lastly, Mr. Pharr utilized the market value or comparable sales approach to valuation. This was accomplished by a telephone survey of real estate appraisers in the area and a follow-up which resulted in three comparable sales. The selection and utilization of these comparable sales through the witness' own testimony is vague and unreliable and warrants no consideration by the Court.
THE FLANAGAN APPRAISALS
In his attempts to obtain municipal review of the tax assessment, Mr. Pharr also submitted to the local Board of Review an appraisal prepared by Robert J. Flanagan MAI of New London, Connecticut dated April 4, 1984. This report was prepared for Gulf and Western Corporation, plaintiff's predecessor.
Flanagan, like Lincoln and Pharr also applied the cost approach analysis utilizing the Marshall Swift valuation service. However, Flanagan departed from Pharr and Lincoln and attached a "straight line" depreciation to the replacement cost instead of utilizing the Weighted Depreciation Tables suggested by Marshall Swift. This is an inappropriate approach under the circumstances because of the nature of the property and its condition. It is undisputed that during this time period the facility was only 22 years old and was well-maintained and in good condition.
The plaintiff presented no expert testimony concerning the Flanagan appraisal and the Court accords it little weight. However, the straight line depreciation method resulted in a depreciation rate of 62.5% to the improvements. The Court finds this to be excessive depreciation for a building only 22 years old. Had Flanagan utilized the method employed by Lincoln, the depreciation rate would have been 43% and the resulting estimate of value of $6,601,810. would have approximated Lincoln's.
THE 1990 BARKIN APPRAISAL
During much of 1989 and 1990 the plaintiff attempted to sell the property. Mr. Carpenter testified that in May 1990 he recommended the property be auctioned for a minimum bid of $2.0 million.
Carpenter received permission to auction the property but was required by plaintiff to obtain yet another appraisal for purposes of setting the auction price.
Daniel Clifford of I.J. Barkin was again retained for this appraisal. Clifford testified that in 1990 he concluded the highest and best use of the property was as a warehouse and distribution center but that financing was no longer available for an expensive retrofitting scenario he suggested in 1987. Clifford also stated he felt there was no longer a market for the type of speculative development he envisioned in 1987.
Clifford rejected the cost approach to valuation because he felt the depreciation was too difficult to quantify. Further he found there were no comparable land sales to use in this analysis.
Clifford also performed an income approach as part of his 1990 appraisal which yielded a market value of $4.0 million which he stated he accorded little weight due to the speculative financing market for which financing for this development scheme was not available.
Clifford also utilized the comparable sales approach, and unlike in 1987, he examined sales outside of Rhode Island. He found there was no market activity for comparable property and was therefore "reluctant to base our value solely on market activity".
Clifford's report reflects prices for comparable buildings ranging from $6.00 to $20.00 per square foot. Because of the "lack of current demand and consequent market activity" Clifford stated there was not "sufficient reliable current data with which to measure and adjust historical market data." Id. at 21. He therefore decided not to make the traditional adjustments to each comparable sale to arrive at an indicated value of the Collyer property.
Instead his opinion of value was based upon in-depth discussions with appraisers, government officers, investors, brokers and real estate analysts concerning the market for large industrial buildings throughout New England.
According to Mr. Clifford, the consensus of opinion was that New England was experiencing a stagnant market characterized by excessive supply and lack of demand. Id. Clifford thereupon drew the reasonable conclusion that "buyers pay less when demand is low and supply is high." Id. He then determined the value of the subject property by the sales comparison approach to be in the range of $3,300,000. to $4,400,000.
THE AUCTION AND ATTEMPTS AT A SALE OF THE PROPERTY
Plaintiff devoted a significant amount of trial time establishing the attempts it made to market the property following the closure of the manufacturing facility. Plaintiff maintained that evidence of aborted sales transactions and protracted negotiations which did not result in a sale are evidence of an excessive tax assessment. Plaintiff urges the Court to undertake a tortured analysis that because it offered the property for sale and auction and because it undertook an aggressive marketing campaign and because the auction produced no bidders at $2.5 million that therefore the property was not worth $2.5 million. Thus according to the plaintiff the property was so palpably overassessed as to amount to overtaxation. The Court declines to engage in such a futile exercise.
Evidence of offers of unconsummated sales and of negotiations leading to such offers are often inadmissible on the issue of valuation. L'Etoile v. Dir. Public Works, 89 R.I. 394,153 A.2d 173 (1959).
 Offers to buy or sell property are treated as an inferior type of sales evidence. Their inferiority is attributed partly to the fact that they represent at best the opinion of one party rather than of two and partly to the difficulty of establishing their bona fide character. Lewis Orgel, Valuation Under the Law of Eminent Domain § 148 2nd ed. 1953.
Consideration of the circumstances surrounding the making of an offer to purchase and negotiations which do not result in a contract for sale can give rise to collateral issues and abject speculation. At best such offers place before the trier of fact an absent person's opinion of value which of course is not subject to the test of cross-examination. The area of collateral inquiry is fruitful as is the opportunity for bad faith on the part of the so-called offeror. 5 Nichols Eminent Domain § 214 [2] at 21-27 n.16 (3rd ed. 1985).
The evidence concerning the auction in which no bids were made is self-serving and speculative. The inference upon inference the Court is asked to draw is simply too large a leap. The Court accords this evidence no weight on the issue of illegal taxation and equitable relief.
Likewise, evidence of a "near sale" during 1989-1990 to Worcester Quality Foods was properly excluded by the Court. Such evidence consisted of drafts of executory sales agreements, not subject to cross-examination. As such this evidence is self-serving, speculative and irrelevant on the issue of market value.
PETER M. SCOTTI APPRAISALS
Plaintiff retained the services of Peter M. Scotti Associates in January 1992 to conduct a review of the property and to render an opinion of value for each year of assessment, beginning in 1981 and for the years 1985 through 1991. Mr. Scotti's approach can best be described as one of hindsight. The value of each opinion rendered by Mr. Scotti diminishes proportionately with its remoteness in time.
Scotti testified he conducted an in-depth physical inspection of the property. He interviewed Mr. Edelson, spoke to several local brokers and reviewed the various appraisals introduced by the parties. He utilized all three approaches to valuation but placed greatest weight on the comparable sales analysis.
In his opinion the property had the following fair market value as of those dates:
 December 31 of Year Fair Market Value
 1981 $3,000,000
 1985 $3,925,000
 1986 $4,100,000
 1987 $4,500,000
 1988 $4,200,000
 1989 $3,465,000
 1990 $2,750,000
 1991 $2,350,000

These opinions are at variance with other appraisals relied upon by the plaintiff which were performed during the actual time period.
Mr. Scotti's analysis produced such widely varying results the Court has concerns about its utility as having any relevance on market value for several of the years.
In performing the cost approach Scotti utilized the Marshall Swift valuation service. He classified the building as a Class C average quality manufacturing facility. He used the building's chronological age and classified its condition as average.
Scotti then departed from the Marshall Swift guidelines. He depreciated what he described as the building's "bone structure", the concrete block and steel frame pursuant to an age-life depreciation method and all other items of depreciation by the "breakdown " method in which individual items of depreciation are identified, evaluated and totaled.
Scotti acknowledged this departure results in greater depreciation than the Marshall Swift guidelines but maintained it was necessary because of the number and complexity of the different items of depreciation present. The difficulty with this analysis is the appraiser relied upon selective historical data relative to the condition of the building and its maintenance or lack of maintenance over the years. This resulted in an overly subjective analysis.
Scotti also performed the income approach to value and assumed the property would be subdivided for smaller uses. Scotti did not calculate the significant renovation costs necessary for a prospective new use because these costs were too speculative. Scotti adopted a rental figure for each of the years but included no comparable properties to support his rental figures. The Court, like Scotti himself, accords this analysis little weight.
Finally Scotti performed the comparable sales approach using sales in Rhode Island, Connecticut and Massachusetts. Scotti acknowledged that the market for comparable sales was "thin" with few real comparable sales available. Nevertheless Scotti insisted that comparable sales was the best indicator of market value.
The Court agrees with plaintiff's experts, Clifford and Scotti that there exists a dearth of sales which are comparable to the subject property. This fact permits a selection of sales whose comparability is questionable at best. The Court is reluctant to accord much weight to this type of analysis. Mr. Scotti provided the Court with a total of only 8 sales during an eight year period. One property sold twice during the analysis period. Of the seven properties identified, four were typical New England old mill buildings. The Court finds these buildings are simply not comparable in age, style, utility or quality to the subject property which is a modern industrial facility built in 1962 of concrete block and steel.
Finally, Mr. Scotti included sales which were lease-back transactions. Sales of this type are subject to a host of collateral matters and as such ought not to be considered as reflective of market prices.
Many factors affect comparability between the subject parcel and other transactions. Corrado v. Providence RedevelopmentAgency, 117 R.I. 647, 370 A.2d 226, Cert denied, 434 U.S. 807, 98 S.Ct. 37, 54 L.Ed.2d 64 (1977). Departure from the comparable sales method is appropriate in condemnation cases where the trial justice determines the subject property to be unique or special purpose. O'Donnell v. State, 117 R.I. 660, 370 A.2d 233 (1977).
While the Court does not reject the comparable sales approach in its entirety, its utility in this case is limited due to the sheer size of this structure. Further, all of the expert witnesses are in agreement the availability of truly comparable transactions, particularly for the years 1989 to 1991 is lacking. This is exacerbated by the conclusions of these same witnesses that market prices fell or were stagnant during this same period.
THE DUPUIS APPRAISAL
Neil J. Dupuis, the present assessor for the Town of Lincoln testified that after the values were established throughout the Town of Lincoln, these assessments remained constant throughout the subsequent tax years including the last assessment of December 31, 1992.
Mr. Dupuis stated there was a uniform common level of assessment of 100% of value as of December 31, 1981. All new property entering the tax rolls was priced according to the 1981 pricing manuals and current sales prices are not considered. Where the property is sold, the assessment remained the same, notwithstanding the sales price.
Mr. Dupuis performed his own appraisal of the Collyer Wire facility and rendered an opinion of value of $7,369,000. as of April 17, 1992. He testified that he performed his analysis utilizing all three recognized approaches. When performing the cost approach Mr. Dupuis did not confine his analysis to the Marshall Swift service exclusively. He first analyzed the original cost of the building and utilizing the comparative cost index provided by Marshall Swift and arrived at a 1992 replacement cost.
He also calculated the replacement cost utilizing the Marshall Swift manual which produced a cost to replace this structure with a facility which was capable of performing the same function, but not an exact duplicate.
Dupuis thereupon applied what he felt was the appropriate depreciation figure. Dupuis chose a 57% depreciation rate "for normal wear and tear of the building." He then factored in adjustments for the roof, heating, electrical and plumbing systems. Mr. Dupuis' approach was to prorate the cost of the replacement of these items over the 10 years of the remaining life of the building. Dupuis added an additional 1.5% depreciation for a total of 58.5%. He then calculated land value through a comparable sales analysis and attached a value of $60,000. per acre for 25 acres of prime land and 4.5 acres of residual land. His opinion of value was $7,369,000.
He also performed a market approach which resulted in the same estimate of market value. His market approach differed from Mr. Scotti's in that he examined sales of similar local properties which were sold twice during the relevant years. By an examination of the change in sales price from one sale to another, Mr. Dupuis concluded the market for facilities such as Collyer Wire was flat or stagnant.
SUMMARY OF APPRAISALS
It is undisputed that the appraisals introduced by plaintiff have produced wide ranging and inconsistent estimates of the value of the subject parcel. A summary of those opinions is as follows:
 December 31
 1981 Town of Lincoln $7,419,490
 Scotti $3,000,000
 1985 Town of Lincoln $7,419,490
 Flanagan $6,601,810
 Scotti $3,925,000
 1986 Pharr $6,150,000
 Scotti $4,100,000
 1987 Enterprise (3/30/87) $8,150,000
 Enterprise (4/3/87) $7,675,000
 Barkin (1/20/88) $7,000,000 to
 $8,000,000
 Barkin (5/8/88) $6,300,000 to $6,500,000
 Scotti $4,500,000
 1988 Scotti $4,200,000
 1989 Scotti $3,465,000
 1990 Barkin $3,300,000 to $4,400,000
 Scotti $2,750,000
 1991 Scotti $2,350,000
 Dupuis $7,369,000

The Court is mindful that plaintiff's burden is not to establish an overassessment Sayles Finishing Plants, Inc. v.Toomey, supra but to prove the various assessments are illegal. Kargman v. Jacobs, supra.
DISPROPORTIONATE ASSESSMENT
The taxpayer further contends that it has been the victim of "disproportionate," and therefore illegal, taxation. However, while disproportionate taxation is illegal and, therefore, if proven, entitles a taxpayer to relief, it has not been proven in this case.
Gen. Laws 1956 (1988 Reenactment) § 4-5-12 provides:
 [a]ll property liable to taxation shall be assessed at its full and fair cash value, or at a uniform percentage thereof, not to exceed 100%, to be determined by the assessors in each town or city. . . . (Emphasis added).
The Supreme Court of Rhode Island has stated that in order to prove a violation of this section, that is, disproportionate taxation, a taxpayer must prove that there has been "a systematic, intentional undervaluation of other property in the locality." Merlino v. Tax Assessors for the Town of No.Providence, 337 A.2d 796, 802 (R.I. 1975). Thus, "in order for [the taxpayer] to prevail in the case at bar, they have the burden of proving that a substantial amount of property in [Lincoln] was taxed at a lower percentage of fair market value than their property." Id.
The taxpayer, in its attempt to prove Lincoln's § 44-5-12,Merlino-type violation for the years in question, proffered the "Annual Report on Assessment/Sales Ratios and the Russell Index", as explained by its witness, Mr. James Savage, of the Department of Administration. For the purpose of distributing state aid to education, this report compares the sale prices of properties sold throughout the State of Rhode Island with their previously assessed value. The pertinent result is an average "assessment/sales price ratio" for each city and town in Rhode Island. The average "assessment/sales" ratio for properties sold in the Town of Lincoln between 1985 and 1990 are as follows:
 1985 (258 sales) 76.6%
 1986 (313 sales) 58.1%
 1987 (236 sales) 42.4%
 1988 (212 sales) 43.6%
 1989 (201 sales) 37.7%
 1990 (161 sales) 39.2%

This raw data appears to indicate, if anything, that property in Lincoln generally sold at prices greater than their assessed value and that the differences became greater as the years passed. Notwithstanding, due to its vehement assertion that this raw data proves, to the contrary, Merlino-type illegal taxation, this Court requested a written offer of proof from the taxpayer concerning why the data should be considered.
In its offer of proof, the taxpayer maintained, first, thatMerlino compels this Court to "separately determine: 1) the assessment to fair market value ratio of the property in question for the tax year or dispute; and 2) the assessment to fair market value ratio of a substantial amount of other property in Lincoln on the assessment date." While Merlino may invite such an analysis, the remainder of taxpayer's reading of Merlino is incorrect, for the taxpayer would then have this Court insert as the "fair market value" in the first prong of this equation the fair market value of its own expert, Mr. Peter Scotti, and make the following findings:
 Assessment:
 Tax Year Lincoln Assessment Actual F.M.V. F.M.V. Ratio
 1986 $7,419,490 $3,925,000 189%
 1987 $7,373,490 $4,100,000 180%
 1988 $7,373,490 $4,500,000 164%
 1989 $7,373,490 $4,200,000 170%
 1990 $7,373,490 $3,465,000 213%
 1991 $7,373,490 $2,750,000 268%
 1992 $7,373,490 $2,350,000 314%

Then, the taxpayer would have this Court use the aforementioned assessment/sales ratio for the Town of Lincoln as the second prong of this equation. Thus, the taxpayer concludes, when this Court sees the very high percentages coming out of the first prong as compared to those of the second prong, there must be a finding of disproportionate taxation.
This the Court cannot do. For one, the taxpayer's argument assumes this Court accepts Mr. Scotti's findings, which it does not. Second, the taxpayer then equates its own fair market value with sales of other properties. Finally, and most importantly, it is evident that the taxpayer misreads Merlino even further by asserting that the § 44-5-12 "full and fair cash value" language means something other than the assessor's opinion of "full and fair cash value." We need to go no further than § 44-5-12 itself, with its "to be determined by the assessors in each town or city" language, to see that this is not the case at all.
On the contrary: Merlino, Rosen v. Restrepo,380 A.2d 960, 961-62 (R.I. 1977), and Oster v. Tellier, 544 A.2d 128, 132 (R.I. 1988), make it perfectly clear that what Mr. Scotti, Mr. Clifford, or even this Court, opines to be the fair market value of the subject property is irrelevant to a disproportionate taxation analysis in the State of Rhode Island.
Despite the taxpayer's exhortations to the contrary, it is clear to this Court that all that § 44-5-12, as expounded byMerlino and Rosen, requires, is that assessors in each of the cities and towns make their own findings as to each taxable property's fair market value, and then assess all of these values either at that full cash value or at a uniform percentage thereof. Moreover, the assessors are entitled to maintain this fair market value figure for a statutory number of years. See
R.I. Gen. Laws § 44-5-11. Thus, while the taxpayer at bar expressed its dismay over the assessor's "hibernation" and "ostrich-like position" over this statutory period, the town, by law, may do precisely that: carry over the same fair market value finding until its statutory revaluation time arrives. That is, of course, unless that estimate is successfully challenged by a taxpayer in a timely fashion, pursuant to R.I. Gen. Laws §§44-5-15 and 16. This was not done in this case.
The taxpayer proffers Piscataway Assoc., Inc. v. Tp. ofPiscataway, 376 A.2d 527 (N.J. 1977) as a logical extension ofMerlino that should be dispositive on the case at bar, pointing to the following language:
 Where a taxpayer's realty is assessed at a true value and such assessment is substantially higher than the common level generally applied to other properties, or in the absence of a common level, than the average ratio of the Director of Taxation, then the taxpayer ordinarily will have shown discrimination and is entitled to relief.
Id. at 530 (emphasis added). However, this language makes it clear that New Jersey has the same common level of assessment requirement as codified here in § 44-5-11, and that when an assessor uses the same percentage of fair market value as its assessment figure, as was done by Lincoln (100%), there is no illegality. While the Piscataway court had to utilize the assessment/sales ratio data in its analysis, it did so because the assessor had utilized that same data to revalue Piscataway's property, a process the court noted as inherently throwing the assessment process into disarray. See, Id. at 529-31. However, Lincoln did not use the data for assessing its property. And while the taxpayer points to Piscataway's language indicating that a common level of assessment loses its validity the longer the valuation is carried over, such is not the case in Rhode Island, where the General Assembly has deemed valuations presumptively valid for a statutorily-delineated number of years. That was not the case in New Jersey at the time of Piscataway.
We need go no further than the Piscataway jurisdiction, New Jersey, to find case law disfavoring the use of this raw ratio data in setting property assessments, whether by assessors or the courts. Continental Paper Co. v. Village of Ridgefield Park,300 A.2d 850 (N.J. Super.App. Div. 1973) and Murnick v. AsburyPark, 471 A.2d 1196 (N.J. 1984), make it perfectly clear that the test for disproportionate taxation, as in Rhode Island, is one of discriminatory purpose, not discriminatory effect. That is, provided a town's assessor uses the same percentage of value as its assessment figure for all properties in a given year, the analysis is at an end.
Notwithstanding, we need to go no further than Rhode Island to find dispositive case law. In Fernandes Realty Corp. v.Lagace, 401 A.2d 43 (1979), the Supreme Court of Rhode Island upheld the decision of a justice of this Superior Court rejecting the use of the very same information for deciding the issue of disproportionate taxation. That taxpayer also presented "only raw statistical data through the representative of the Department [that compiled the data]. Id. at 45.
All of these cases reflect the view that shattering the assessor's presumed proper valuation solely by the use of this type of data "fails to take cognizance of the essential difference between the concepts of average ratio of assessment to true value for equalization table purposes and common ratio of assessment." Continental, supra, 300 A.2d at 854 (quotingNorth Bergen Tp. v. Venino, 131 A.2d 792, 794 (App. Div. 1957) (emphasis removed). Moreover, as a practical matter, using the assessment/sales ratio data in any form whatsoever would be very likely to turn what is now a clear legislative mandate — to make the assessment and tax collection process as uncomplicated as possible while remaining fair to taxpayers — into disarray.
In order to sustain a charge of disproportionate taxation the plaintiff must demonstrate a systematic, intentional undervaluation of other property in the locality, Merlino v. TaxAssessors, supra, Fernandes Realty Corp. v. Lagace, supra.
The taxpayer has not sustained this burden. Mr. Savage merely produced, in response to a subpoena, the sales/assessment ratios for the relevant years. He frankly admitted that no studies were made to determine whether these sales were in fact arm's length transactions. Further, no distinction was made between industrial properties and other commercial locations such as stores. Thus the data itself is very unreliable and cannot be used to make a calculation of systematic, intentional undervaluation of numerous parcels of property in Lincoln but not the plaintiff's property. The Court rejects this challenge to the assessment.
THE 1985 THRU 1989 ASSESSMENTS
For tax assessment years 1985 through 1989 the Court finds the plaintiff has failed to meet its burden of proving the assessment for these years is illegal. Indeed, while it would be a gratuitous finding under Sayles Finishing it is doubtful the plaintiff has proven it was overassessed during these years.
As noted, the evidence and appraisals relied upon by the plaintiff do not support a finding palpably excessive assessments which amount to illegal taxation. CIC-Newport Associates v.Stein, 403 A.2d 658 (R.I. 1979).
The Court finds the Collyer Wire facility was fully operational as an industrial manufacturing facility through 1988. That it was a well-maintained modern industrial facility with no evidence of functional obsolescence and no evidence of significant deterioration.
The appraisals introduced by the plaintiff, specifically the first drafts of the Enterprise, and Barkin studies are in excess of the Town's assessment. The Carl Pharr appraisal included an inappropriate deduction of 21% for "economic obsolescence" which the Court rejects. Without this reduction, Pharr's estimate is consistent with Lincoln's.
The review conducted by Mr. Scotti for these years is likewise accorded little weight. His analysis was limited by the use of historical data and selective information and produced such drastically reduced estimates as to be unreliable and of little assistance and is rejected for these years.
The taxpayer has simply failed to demonstrate it was overassessed for tax years 1985, 1986, 1987, 1988 and 1989.
The 1986 and 1988 assessments are also challenged pursuant to § 44-5-27 which permits a taxpayer to demonstrate this is a proper case for the exercise of the Court's equity jurisdiction. Plaintiff's argument in support of its resort to equity is identical to its challenge pursuant to § 44-5-26(b)(2). Plaintiff's case rests upon the premise that the Collyer facility suffered such a severe loss in market value over the years that equity commands relief.
Plaintiff acknowledges however that its equity argument gets stronger as the years pass and the disparity between the tax assessment and the true value of the property widens. The Court agrees. Assessment years 1986 and 1988 are not proper cases to invoke the Court's equity jurisdiction. There is simply no reliable evidence this property was overassessed. It was also fully functional as a wire manufacturing facility through 1988. Plaintiff was in the process of selling the Collyer Wire business and intended to sell the property during this period. The Court has found that during 1988 Wickes arranged an intra-corporate transfer of the property and engineered a sales price which was below market value. This conduct militates against an equitable remedy especially when the taxpayer relied upon this sale as evidence of market value.
The Court therefore finds plaintiff is not entitled to any relief either at law or in equity for these years.
THE 1990 AND 1991 ASSESSMENTS
As of December 31, 1990 the facility had been closed for two years and had suffered significant deterioration during this period. The Court recognizes this loss in value is attributable to neglect and waste on the part of plaintiff. However, the Court finds this deterioration to adversely affect the market value of the property for assessment years 1990 and 1991. However again, this diminution in value, standing alone does not rise to the level of illegal taxation and does not amount to constructive fraud upon the taxpayer. CIC-Newport Associates v. Stein,supra. A mistake in valuation or an overassessment does not amount to illegal taxation.
Where, as here, the loss in value results in mere overassessment due to extrinsic forces beyond the control of the Lincoln Tax Assessor it can not result in illegal taxation. This overassessment was the direct result of the closing of the plant by the taxpayer who allowed the building to deteriorate and through no action on the part of the tax assessor. The taxpayer had an adequate remedy by which to seek review of the assessment. The failure of the taxpayer to file an account is fatal to its claim for the 1990 assessment.
Civil Action 92-1672 which challenges the 1990 assessment is not a case available to the taxpayer to invoke the Court's equity jurisdiction. The Court therefore declines to calculate a fair market value for the parcel for 1990 because such finding is irrelevant to this proceeding. Thus for 1990 the plaintiff has not met its burden of proving the assessment was illegal and is entitled to no relief.
The taxpayer challenges the 1991 assessment on several grounds. Plaintiff alleges that as of December 31, 1991 the facility had been closed for three years and was in such a serious state of decay and disrepair as to be worth a fraction of its assessed value. Plaintiff asserts this loss in value renders it the victim of illegal taxation.
Plaintiff also contends that pursuant to § 44-5-11 the assessor for the Town of Lincoln was required to implement a town-wide revaluation for 1991. Gen. Laws 1956 (1988 Reenactment) § 44-5-11 requires that each city and town revalue all ratable real estate and implement a revaluation every ten years. Lincoln admits that pursuant to § 44-5-11, December 31, 1991 was the tenth year following the 1981 revaluation. Lincoln acknowledges it did not revalue its ratable real estate and relies upon a special act of the General Assembly, P.L. 1992, Ch. 310, as a defense. This act amended § 44-5-11 and extends until December 31, 1993 the period in which Lincoln and several other communities must revalue their taxable real estate and implement the revaluation.
Plaintiff asserts this act did not become effective until July, 1992, some six months after the 1991 assessment, and that it should not be given retroactive application.
The general rule in Rhode Island is that statutes are given prospective application unless the Legislature by express language or necessary implication, manifests an intention that the statute be given retrospective application. Richtmyer v.Richtmyer, 461 A.2d 409 (R.I. 1983); State v. Healy,410 A.2d 432 (R.I. 1980); Spagnoulo v. Bisceglio, 473 A.2d 285 (R.I. 1984). If it appears by strong, clear language or necessary implication that the Legislature intended the statute to have a retroactive effect, it will be applied retroactively. Lawrencev. Anheuser-Busch. Inc., 523 A.2d 864 (R.I. 1987); Dulgarian v.City of Providence, 507 A.2d 448 (R.I. 1986). It is only when a statute lacks such specificity or necessary implication that a distinction is made between a substantive and remedial or procedural enactment. Lawrence v. Anheuser-Busch. Inc.,supra.
The necessary implication contained in P.L. 1992, Ch. 310 is that the statute be given retroactive effect. This act extends the period during which the Town of Lincoln must implement a revaluation. The Legislature, by necessity, intended the period to be extended from December 31, 1991 to December 31, 1993. The fact that the statute was not enacted until July, 1992 is irrelevant to a valid extension of this period. If the Legislature did not intend retrospective application then the act would have no effect at all and would be a nullity. The Court will not attribute such an intent to the Legislature. Thus in order for the statute to have any effect, it must be given retrospective application.
However, the 1991 assessment is a proper case to invoke this Court's equity jurisdiction. The Court finds that while Lincoln may have had a legal right to delay its town-wide revaluation it was improper to do so. The equities in this case dictated the plaintiff was entitled to a new tax assessment, notwithstanding its failure to file an account. The Court finds that had Lincoln conducted a revaluation as it should have, the taxpayer's assessment would have been lower than the assessment of December 31, 1991. The Court finds the Collyer Wire facility to have a fair market value which is lower than the assessed value and lower than the opinion expressed by Mr. Dupuis. Since Mr. Dupuis is the tax assessor for Lincoln and has already conducted an appraisal for this facility, were the Court to order Lincoln to revalue the property, Dupuis' figures, in all likelihood would reflect his testimony at trial and be excessive. Thus the Court will determine what is an appropriate assessment.
A trial judge may pick and choose among evidence presented by experts Kargman v. Jacobs, 325 A.2d 543 (1974) and where, as here she finds the evidence of each expert unreliable, she has discretion as does any trier of fact to ascertain on the basis of the entire record the appropriate assessment. See, Ashton v.Jamestown Tax Assessors, 60 R.I. 388, 391, 198 A. 786 (1938),Order of St. Benedict v. Gordan, 417 A.2d 881, 884 (1980).
The Court rejects the income approach and the market sales approach for this particular property. Due to its size, age, condition and utility, the most reliable approach to valuation was and remains its replacement cost less properly applied depreciation.
The Court accepts that portion of Mr. Dupuis' appraisal relating to actual replacement cost for the structure. The Court finds Mr. Dupuis to have properly calculated the replacement cost of the building utilizing the Marshall Swift valuation service. The Court finds that Mr. Scotti's calculation of replacement cost to be incorrect because he failed to use the proper current cost and local cost multipliers. According to Mr. Dupuis the replacement cost of this structure as of April, 1992 was $14,078,000.
According to Mr. Dupuis, the Marshall Swift service suggests a depreciation value of 54% as of 1991. Mr. Dupuis calculated a depreciation figure of 57% to which he added another 1.5% due to the condition of the roof and the need for heating, electrical and plumbing repairs. Mr. Dupuis in effect pro rated the cost of these repairs over the last 10 years of the building's economic life. The Court rejects this analysis because it fails to consider the true condition of this property.
Mr. Scotti adopted a 72.5 percent depreciation value using an age-life method. He thereupon adopted a breakdown or component method of depreciation and calculated actual estimated costs for curable physical obsolescence. The Lincoln tax assessor disagreed with this analysis and suggested this was evidence of double depreciation in that portions of the building were depreciated twice.
The Court finds the component or breakdown analysis to be an appropriate method by which the condition and value of this rather unique structure can be recognized.
Accordingly, the Court finds 54% to be an appropriate depreciation figure and that the total amount of curable physical obsolescence as calculated by Mr. Scotti to be $2,627,000. Accordingly, the building value is calculated as follows:
 $14,078,000 Cost to replace
 - 7,602,120 54% Depreciation
 6,475,880 Depreciated Cost
 - 2,627,000 Curable physical obsolescence
 $ 3,848,880 Total Building Value

The value of the land is also hotly disputed by the parties. Mr. Scotti suggests a per acre cost of $22,000. or $649,000. The Lincoln assessor conducted an analysis of industrial land sales which were more local to the subject property. The Court finds these sales to have been properly adjusted for size, time and location and the Court adopts Mr. Dupuis' $60,000. per acre figure.
The Court notes that in 1981 Lincoln assessed the land at $20,000. per acre. Mr. Scotti's 1991 estimate is only $22,000. and is unfounded and erroneous.
Therefore the Court finds the total land value (including the value of the excess land) to be calculated as follows:
 25 acres primary site x 60,000/acre = $1,500,000
 4.57 acres residual land x 6,000/acre = 27,400
 $1,527,400

Therefore a total assessed value of $5,376,280. is hereby adopted by the Court as of December 31, 1991.
It is undisputed that Plaintiff has paid all taxes due in tax year 1992 and is therefore entitled to a judgment for the amount of excess taxes paid in Case No. 92-1671.
Defendant is entitled to a judgment denying an dismissing all other cases. Counsel shall submit an appropriate form of judgment in each of the above actions for entry by the Court.
[1] As noted supra the property was originally built by the Industrial Foundation of Rhode Island and leased to Collyer Wire for economic development in a long-term lease with an option to purchase. As of May 17, 1987 for the very period Pharr is utilizing a series of intra-corporate transfers, Wickes Foundation was "leasing" the property to Wickes Manufacturing Company.